CORNELIA A. WALKER, AS TRUSTEE OF NEXT OF KIN OF RICHARD A. WALKER, AND OTHERS v. KENNETH H. LARSON.

169 N. W. (2d) 737.

July 3, 1969—No. 41603.

*Feidt, Lang & Pauly* and *Roger A. Pauly,* for appellants.

*Peterson & Holtze* and *Terry M. Erskine,* for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Frank T. Gallagher, JJ.

NELSON, JUSTICE.

This is an action against defendant, Kenneth H. Larson, by plaintiffs, Cornelia A. Walker, as trustee of the next of kin of Richard A. Walker, and Milen F. Walker and Cornelia A. Walker, individually, to recover damages sustained as the result of the death of their son, Richard A. Walker, arising out of a motor vehicle accident which occurred June 12, 1964, at the intersection of Chicago Avenue and 28th Street, Minneapolis, Minnesota.

The matter was tried in Hennepin County District Court before a jury. The jury returned a verdict in favor of defendant, and plaintiffs moved for a new trial. The trial court denied the motion and judgment was entered in favor of defendant. Plaintiffs now appeal from that judgment.

The facts appear to be as follows: The accident occurred at approximately 12 o'clock noon June 12, 1964. Richard A. Walker, decedent, was operating a red Willys pickup truck (sometimes referred to as a jeep) in an easterly direction on 28th Street, and defendant was operating a white Chevrolet truck in a southerly direction on Chicago Avenue. A collision occurred between the two vehicles at the intersection of Chicago Avenue and 28th Street. Twenty-eighth Street is a four-lane, one-way street leading in an easterly direction. Chicago Avenue runs in a north-south direction and has two lanes for traffic moving in each direction and a parking lane on each side of the street. The speed limit is 30 miles per hour on both streets, and both are fairly level and straight near the intersection.

Movement of traffic in the intersection was controlled by semaphore lights, and one of the crucial fact issues in the case involved the color of the semaphore lights at and immediately prior to the time of the accident. Defendant testified that the light was green for him and estimated the speed of decedent's truck at 25 to 30 miles per hour. Two witnesses traveling behind the red pickup said the light governing traffic on 28th Street was red when the pickup entered the intersection. These witnesses' testimony referred to the light changing from green to red and never mentioned a change from green to amber to red, as was the proper color sequence. In contrast, plaintiffs' two eyewitnesses, who had seen the accident from different places, both testified that the light was green for 28th Street traffic. Plaintiff also presented evidence relative to the timing of the traffic signals.

Michael Kohler, a passenger in decedent's vehicle at the time of the accident, was subpoenaed to testify for defendant and upon being questioned stated that he had no recollection of the accident in question. After asking him several questions to establish foundation, defendant offered into evidence a statement given by Michael prior to trial, and this statement was received in evidence over plaintiffs' objections. On this appeal they assert its reception was error requiring a new trial.

■ Michael's statement was given in the presence of three witnesses—the investigating officer, Thomas Russell; a police stenographer, E. C. Anderson; and Matt J. Kohler, Michael's father. The signatures "Thomas Russell" and "Matt J. Kohler" appear on the statement, and the act of signing was testified to by Officer Russell. Michael initialed the first page and signed at the end of the statement. This statement was given the day after the accident and within 1 hour before his discharge from North Memorial Hospital. He was diagnosed as having suffered multiple abrasions and a mild cerebral concussion. The substance of Michael's signed statement is as follows:

"Q.　What is your full name?

"A. Michael John Kohler.

"Q. What is your address?

"A. 1508 Lyndale Avenue North.

"Q. What is your age?

"A. 18 years.

"Q. What is your telephone number?

"A. Ja. 2 9236.

"Q. Were you a passenger in a jeep truck involved in an accident at 28th and Chicago at approx. 12:20 PM June 12, 1964?

"A. Yes.

"Q. What types of vehicles were involved in this accident?

"A. A jeep pick up truck and another big white truck.

"Q. In what direction was each travelling?

"A. The jeep was going east down 28th and the other was going down Chicago, south.

"Q. Where was this white truck when you first seen it?

"A. It was on the corner of 28th and Chicago, about half way into the intersection.

"Q. How fast would you say this truck was going?

"A. I don't know.

"Q. How fast was the jeep truck you were travelling in going prior to the accident?

"A. About 35.

"Q. Who entered the intersection first—which truck?

"A. The one travelling on Chicago—the big one.

"Q. Did you see any skid marks?

"A. No I didn't.

"Q. Describe the traffic conditions at the time of this accident?

"A. It wasn't very heavy.

"Q. What were the weather conditions at the time of this accident?

"A. Sunny. Streets were dry.

"Q. Do you know of any other witnesses to this accident?

"A. No.

"Q. How was the light on the intersection of 28th and Chicago as you entered the intersection?

"A. It was red for us.

"Q. Has anyone discussed this accident with you?

"A. Just you and my dad.

"Q. Did you notice anything about either of the drivers? Had either of them been drinking?

"A. I know the one I was with hadn't. Don't know about the other. I didn't see him.

"Q. There was a beer bottle in the truck. Do you know anything about this?

"A. I had had it earlier.

"Q. Do you know if at any time prior to this accident if the driver of the red truck had had anything to drink?

"A. No, I don't know. I didn't see him drink anything.

"Q. Did you see any other cars around you that were also going east on 28th Street?

"A. No.

"Q. Did you notice what the driver of the jeep truck was doing—which way he was looking or was he doing anything unusual as you approached the intersection?

"A. I told him the light was red. He slammed the brakes on about the time I told him or the time we were hit.

"Q. Did you have any conversation with the other driver?

"A. No.

"Q. Were you ejected from this jeep vehicle at the time of impact?

"A. I don't know but by the time I came to I was on the street.

"Q. Is this a true statement, given of your own free will and accord?

"A. Yes.

"Q. After you have had a chance to read this statement are you willing to sign it if you find it to be true and correct?

"A. Yes."

There is no evidence that Michael suffered a lapse of memory for any medical or psychological reason. He made no complaints of headaches or dizziness according to the hospital nursing notes. There is no testimony that anyone present at or investigating the accident scene had observed anything about Michael showing signs of a concussion, mental confusion, or irrationality at that time.

An examination of Michael's statement indicates that his answers were clear and intelligent and there is no indication that such statement was given under the stress of a confused or disoriented mind. At trial Michael, upon inspecting his statement, claimed he was unable to state the facts therein from memory. This situation has been sharply distinguished by the courts from the usual use where the witness' memory is truly refreshed by the statement so that he can testify from memory and not from the writing.

Michael was asked if the answers he gave in his statement were true, and he answered, "I don't remember answering anybody, so I don't know." He was asked, "That is your father's signature, is that right?" and his answer was, "I guess so." Later, in response to the court's question, he admitted that he did not know his father's signature. Michael was asked if he would have signed a statement in the presence of a police officer if it were not true, and he replied, "No, I guess not." When asked, "Would you have signed a statement in the presence of the police officer without first reading it?" he answered, "No, I wouldn't."

Admittedly, the veracity of the statement is properly for the jury to determine. It was the prerogative of the court to determine, in the exercise of its judicial discretion, whether the statement should be admitted into evidence under the facts and circumstances of this case. There were no known or apparent complications due to Michael's injuries when the statement was taken nearly 24 hours after the accident occurred. None of the individuals present at the taking of the statement, including Michael's father, was called to testify as to any unusual condi-

tions that they may have noticed at the time the statement was given or signed.

It is the contention of defendant that a written and witnessed statement bearing the signature of its alleged author made prior to commencement of litigation and relating to material issues at trial is admissible in evidence. It appears to be well settled that an authenticated memorandum of past recollection may be properly received in evidence as an exception to the hearsay rule. Thomes v. Atkins (D. Minn.) 52 F. Supp. 405; 3 Wigmore, Evidence (3 ed.) § 734, et seq.; McCormick, Evidence, § 277. The authorities indicate that the underlying reasons for allowing records of past recollection to be admitted into evidence are that those records are often essential to the discovery of truth at trial and generally much more reliable than oral testimony. 3 Wigmore, Evidence (3 ed.) § 734, et seq. Thus, to exclude such a record when honestly made would be to reject the best and frequently the only means of arriving at the truth. Halsey v. Sinsebaugh, 15 N. Y. 485. Always the trustworthiness of the record received in evidence is of paramount concern. Thus, before a memorandum of past recollection is admitted, the court must be satisfied, first, that the memorandum reflects the firsthand knowledge of its author; second, that the recording was made while the facts were fairly fresh in his mind; third, that the record is a true and accurate account of what he perceived. 3 Wigmore, Evidence (3 ed.) §§ 745, 746, 747.

According to McCormick, Evidence, § 277, the manner in which the truth and correctness of the record may be verified has not been limited to one rigid rule, but may be accomplished in several acceptable ways:

"The testimony preliminary to the admission of the memorandum, when the writing is one written or signed by the witness who observed the facts recorded must include a voucher by the witness of the accuracy of the writing. This may of course be a statement that he remembers that he correctly recorded the facts. But if his memory does not serve so far, it is sufficient if he says

that he knows it is correct because it was his habit or practice to record such matters accurately. Or even short of this, it is acceptable if he states that he is satisfied that it is correct because he recognizes the handwriting or signature as his own, and believes that he would not have written or signed it unless it were true."

■ The question has been presented whether a record of past recollection is sufficiently verified if the author recognizes his signature and testifies that he would not have signed a statement without first reading it and that he would not have signed a record that was not true. This type of verification is generally held sufficient on the basis of the general moral attitude of the individual making and signing the statement. 3 Wigmore, Evidence (3 ed.) § 747; Morrow v. Board of Trustees of Park College, 353 Mo. 21, 181 S. W. (2d) 945.

Plaintiffs placed great reliance on Hodas v. Davis, 203 App. Div. 297, 196 N. Y. S. 801. In that case it appeared at the trial that an eyewitness of an accident had a partial memory failure and could testify only that he had observed an accident; that he had been playing ball near the scene; that there was a wrecked car near the railroad crossing; that a train stood still at the crossing; and that the body of a man was taken aboard the train. Upon being shown a statement containing a more detailed account of the accident, the witness recognized his signature on the statement and testified that he had never signed any paper which did not contain true facts within his own knowledge. This statement was subsequently received in evidence. The New York court, however, held, upon a strict and narrow reading of past New York law in the area, that such verification was not sufficient to insure the reliability of the statement and that its admission constituted error. The court went on to hold, however, that because the facts contained in the statement were established by the testimony of several other witnesses, no substantial right of the plaintiff had been affected by the admission of the statement in evidence.

The court in the Hodas case said (203 App. Div. 301, 196 N. Y. S. 803) :

"* * * Belief in the correctness of a subscribed statement arises in the mind of a subscriber from a variety of causes known and unknown. It is an instinctive conviction, and therein lies its value. Such a belief cannot be supplied by any other than its maker upon any theory that what *might* justly have been believed *was* believed."

This rationale appears to be in conflict with the other authorities cited above and the flaws therein are evident. As argued by defendant, the New York court did not discuss and must have disregarded the following important factors: The time at which the statement was given; the setting and circumstances under which the statement was given; whether there were any witnesses to the statement; possible bias of the author; and whether the author was motivated by this bias in such a way that suspicion could be cast upon his memory failure at trial. The Hodas case would accept as verification only the subjective belief of the author and completely disregarded any and all objective factors tending to show the authenticity of the statement.

We think there is danger in adopting a position such as this for the reason that a witness, even though he had previously authenticated a statement given by him, could, following the reasoning of Hodas, prevent an entirely correct and truthful statement from being presented to the trier of fact merely by showing a convenient loss of memory at the time of trial. To allow a witness the option to reveal or conceal the truth at trial, especially when suspicion may be cast on his credibility, would result in impeding justice.

■ To the extent that this court has considered and passed upon similar facts, it has left much to the discretion of the trial judge in the matter of receiving such a statement in evidence and permitting the jury to consider its effect, together with the other evidence in the case. The conflicts in the testimony here as to the

directional lights at the time of the accident weigh heavily on the side of defendant. We have said that the trial judge is in the best position to pass on all the facts and circumstances regarding the reliability of records of past recollection and that his discretion should be questioned only when its abuse is clearly shown. Sullivan v. Minneapolis St. Ry. Co. 161 Minn. 45, 200 N. W. 922; Carlton v. Carey, 83 Minn. 232, 86 N. W. 85; Ostrowski v. Mockridge, 242 Minn. 265, 65 N. W. (2d) 185, 47 A. L. R. (2d) 733. In reasoning that a memorandum of past recollection was admissible in the Sullivan case, this court commented (161 Minn. 53, 200 N. W. 925):

"* * * The object of evidence in a legal controversy is to ascertain the truth. Resort should be had to every proper means of learning the truth. Technical rules should not be sustained which obscure the truth instead of exposing it. The rule of defendant company requiring the making of this report had no reference to the matter in controversy in this litigation. The compliance with the rule had no reference to plaintiff's claim because her claim was then unknown to the motorman. Of course the existence of the rule was perhaps for the purpose of getting the facts causing and surrounding an emergency stop so that they would be known and available if claims arose out of such stops. But assuming that the motorman knew this, how could it be conceived that he would have surmised that the particular questions here involved might have arisen? Under such circumstances, the report is not self-serving. That it is pertinent and convincing testimony is shown by the earnest argument of counsel that the reception of this evidence was prejudicial. In fact, the nonproduction of such a report would probably result in severe criticism, if not a presumption of the report being unfavorable to it. The trial court should scrutinize carefully the foundation for the reception of such evidence, but when the foundation is established such report is admissible as original evidence."

The trial court's memorandum in the instant case clearly reveals that the trial court gave more than passing attention to the question of admission of Michael Kohler's statement.

Certain rules of thumb have been approved by this court as guidelines for determining the sufficiency of verification of memoranda of past recollection. For instance, original entries of transactions were held to be admissible upon an author's testimony that entries in the memorandum were in his own handwriting and were just and true, Newell v. Houlton, 22 Minn. 19; where the recorder testified that his report was in his own handwriting and was a "correct" report made and submitted in the ordinary course of business, Naas v. Chicago, R. I. & P. Ry. Co. 96 Minn. 84, 104 N. W. 717; where the witness testified concerning a check list made by him that he knew the list to be correct, Meyers v. McAllister, 94 Minn. 510, 103 N. W. 564; and where the author of entries in certain business memoranda stated that he knew they were correct at the time he made them, Force v. Gottwald, 149 Minn. 268, 183 N. W. 356.

Hoffman v. Chicago, M. & St. P. Ry. Co. 40 Minn. 60, 41 N. W. 301, and Salo v. Duluth & I. R. R. Co. 121 Minn. 78, 140 N. W. 188, both concern memoranda of past recollection, the contents of which were not personally observed by the author, but rather obtained from a secondhand source of information. In both cases it appeared that each author had no opportunity to observe firsthand the facts recorded in the memorandum. Neither author was in a position to verify the truth and correctness of facts he had obtained secondhand. Thus, the court held that admission of each memorandum into evidence was error, not because of failure by the author to assert his instinctive conviction of belief in the correctness and truthfulness of the memorandum, but rather because the author had no firsthand knowledge of the facts contained therein.

A survey of Minnesota law reveals that the above rules of thumb have been developed in the framework of the situations presented at trial. The cited cases indicate this court's in-

clination not to be bound by technical rules of exclusion and to grant the trial judge wide discretion. Other courts have seen fit to allow the author to call to his aid his moral attitude and have held a memorandum of past recollection to be properly verified upon the witness' testimony that he recognizes his signature and would not have signed if the memorandum had not been a true record of the facts. Putman v. Moore (5 Cir.) 119 F. (2d) 246; Fowler v. Stamford (D. C. Mun. App.) 89 A. (2d) 885; Poirer v. Poirer (Pa.) 31 Del. Co. 583.

We must hold upon the record herein that the admission of Michael Kohler's statement into evidence was not error and that the evidence was ample to sustain the verdict of the jury.

Affirmed.